UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**CHRISTINE MAGILL,**

**Plaintiff,**

**v.**                                    **5:01-CV-1482**

**PRECISION SYSTEMS MFG., INC. and**
**J.G.B. ENTERPRISES, INC.,**

**Defendants.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

Sonneborn, Spring & O'Sullivan, P.C.
Laura L. Spring, Esq., of Counsel
241 West Fayette Street
The Seneca Building
Syracuse, New York 13202
Attorneys for Plaintiffs

Hancock & Estabrook, LLP
John T. McCann, Esq., of Counsel
Lindsey Helmer Hazelton, Esq., of Counsel
1500 MONY Tower I
Syracuse, New York 13221
Attorneys for Defendants

**Hon. Norman A. Mordue, D.J.:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

In this action under Title VII, 42 U.S.C. § 2000e-1, *et seq.*, and the Americans with

Disabilities Act of 1990, 42 U.S.C.A. § 12101, *et seq.*,[1] plaintiff alleges that while employed by

---

[1] Plaintiff stipulated to abandon her Equal Pay Act claim.  *See* 29 U.S.C.A. § 206(b), *et seq.*

defendant Precision Systems Mfg., Inc. ("PSMI") she was subjected to discriminatory terms and conditions of employment on the basis of her sex and disability, including suffering retaliation for having opposed what she reasonably believed to be discrimination.  Her claims are primarily based on the alleged conduct of Vincent Foriero, President and 20% shareholder of PSMI at the times in issue, and, beginning in October 1998, plaintiff's direct supervisor.

Presently before the Court are two motions: (1) a motion by defendant J.G.B. Enterprises, Inc. ("JGB") (Dkt. No. 48) for summary judgment; and (2) a motion by PSMI (Dkt. No. 59) for summary judgment.  On February 16, 2006, this Court granted the motion by PSMI (Dkt. No. 67) to strike Exhibit A to plaintiff's affidavit in opposition to PSMI's summary judgment motion and adjourned PSMI's time to reply.  The Court has now received PSMI's reply papers on the summary judgment motion (Dkt. No. 76).  For the reasons set forth below, the Court denies JGB's summary judgment motion and grants PSMI's motion only insofar as it seeks dismissal of plaintiff's claims under the Americans with Disabilities Act.

**DISCUSSION**

**Summary judgment standard**

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the Court, viewing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in the nonmovant's favor, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial.  *See Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.

1989).  If the nonmovant fails to carry this burden, summary judgment is appropriate.  *See Celotex,* 477 U.S. at 323.

**PSMI's motion for summary judgment**

*Sexual harassment and/or hostile work environment – generally*

PSMI's first contention in support of summary judgment is that, as a matter of law, plaintiff was not subjected to sexual harassment and/or a hostile work environment at PSMI.   In order to establish a violation of Title VII by an employer under a theory of *quid pro quo* sexual harassment, "a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment."  *Karibian v. Columbia Univ.,* 14 F.3d 773, 777 (2d Cir. 1994).  To establish a violation of Title VII under a hostile work environment theory, a plaintiff must show that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and that a specific basis exists for imputing to the employer the conduct that created the hostile environment.  *See Richardson v. New York State Dep't of Corr. Serv.,* 180 F .3d 426, 436 (2d Cir. 1999).

*Plaintiff's allegations*

Briefly, based on plaintiff's affidavit and deposition testimony, plaintiff's allegations are as follows.  At all relevant times, time, plaintiff was a divorced mother of two young children.  She had been employed since 1988 by Precision Systems, Inc., PSMI's predecessor.  In 1998, Precision Systems, Inc. was purchased by Jay Bernhardt, who became 80% owner of PSMI, and Vincent Foreiro, who became 20% owner.  They retained the employees of Precision Systems,

Inc., including plaintiff, who was then an office manager, and Carol Hornstein, who became PSMI's Human Resources Manager.  Foriero became President of PSMI.  Initially, plaintiff's direct supervisor in PSMI was Rick Lis, Operations Manager.

In April 1998, Foriero and Hornstein offered plaintiff a raise and a promotion to Materials Manager.  Plaintiff states that she accepted on the condition that she would be trained for the additional responsibilities.  According to plaintiff, beginning in the summer of 1998 and until he terminated her on February 27, 1999, Foriero attempted to insinuate himself into her personal life and to use his supervisory status over her as a way of controlling her.  For example, on one Saturday in August 1998, she was working alone and he came to the office, apparently drunk, and stated that she needed to change her standards and her friends.  He said that to move up in PSMI she needed to have a different way of thinking.  He tried to hug and kiss her.  Plaintiff states that on this and all other occasions, she made it clear to Foriero that his attentions were unwelcome.

According to plaintiff, in September 1998, Foriero began to speak of grooming plaintiff for the position of Operations Manager and on one occasion, in his office, he again attempted to hug and kiss her.  In October 1998, PSMI's Operations Manager Rick Lis left the company and plaintiff came under Foriero's direct supervision.  During the next few months, Foriero repeatedly intruded into plaintiff's personal life.  For example, in late October, as plaintiff was leaving a lunchtime Halloween party at her son's day care center, she saw Foriero in his car parked near her car in the day care parking lot.  On the same day, he told her she was the most important thing in his life.  Throughout this time period he bought gifts for her and her children.  He repeatedly told her that to move up in PSMI she should be free from "outside influences" and should commit herself to work, her children and religion.

-4-

Plaintiff further alleges that in November 1998 Foriero became angry when he learned that she had a boyfriend.  He repeatedly criticized her for having outside influences and made personal remarks such as stating that she should not have a boyfriend and that he just wanted to make her and her children happy.  He also repeatedly complimented her.

Plaintiff avers that in December 1998, after learning that plaintiff was wearing a watch given to her by her boyfriend and not the watch Foriero had given her, Foriero told her she "was never going to make it" in the company and that he "would not be able to groom her properly for the Operations Manager position."  He continued to ask plaintiff about her personal life, to comment on her dress and jewelry, to make other inappropriate personal remarks and to telephone her at home.  When she was in the office he would criticize her and then later apologize.  Plaintiff sets forth specific instances of this conduct.  She states that she was afraid she would lose her job.

According to plaintiff, this conduct continued into January and February 1999.  Plaintiff describes a number of specific instances.  On one occasion Foriero followed her in his car on her lunch hour.  Frequently when she arrived at work in the morning she would find him sitting at her desk.  On February 2, 1999, Foriero became angry, chased plaintiff out to her car, and held the door so she could not close it, telling her he wanted her to "fix his heart."  He sent her a card for Valentine's Day with printed endearments such as, "You're so gosh-darned huggable."  He also implied that the reason he had given plaintiff a raise in April 1998 was that he was in love with her.  On one occasion in February, he fired her, then went to her house, explained to her that it would not "look good" to the Board of Directors if she had a boyfriend outside the company, and then rehired her.

-5-

Plaintiff alleges that on February 26, 1999, Foriero detained plaintiff in his office for over four hours, berated her and criticized her work performance.  The following day, February 27, 1999, a Saturday, she went to work as previously arranged with another employee to finish a project.  Foriero came in, became angry at her, and then terminated her.  She went home, and Foriero then went to her house, whereupon she telephoned the police.  She then left a telephone message for Bernhardt, who returned her call from the office with Hornstein on the speaker phone. According to plaintiff, she told Bernhardt about the many incidents of sexual harassment leading up to the events of that day.  She said that on the next day Bernhardt told her she was not fired.

Thereafter, plaintiff took medical leave and did not return to work.  She said that after what had happened she could not work with Foriero.  PSMI and/or JGB retained an independent consultant to investigate the matter.  Plaintiff did not meet with the investigator.  She claims that he insisted on meeting her without her attorney when she was still too upset to discuss what had happened; that she was willing to cooperate with an investigation when she was well enough to do so; but that PSMI unilaterally cut off the investigation and prevented  a reasonable investigation.  On June 25, 1999, Hornstein sent plaintiff a termination letter.

*Sexual harassment and/or hostile work environment – conclusion*

The Court finds that plaintiff's affidavit and deposition testimony present sufficient evidence upon which a reasonable trier of fact could find that she had been subjected to sexual harassment and/or a hostile work environment at PSMI.  Accordingly, summary judgment on this ground is denied.

*Retaliation – Title VII*

-6-

To establish a *prima facie* case of retaliation, plaintiff must show that (1) she was engaged in protected activity, that the employer was aware of that activity, (2) that she suffered adverse employment action, and (3) that there was a causal connection between the protected activity and the adverse employment action.  *See Quinn v. Green Tree Credit Corp.*  159 F.3d 759, 769 (2d Cir. 1998).

Here, plaintiff asserts that her sexual harassment complaints to Hornstein and Bernhardt on February 27, 1999, constitute proof of protected activity of which PSMI was aware. According to plaintiff, PSMI's alleged failure to make reasonable attempts to investigate and resolve the issue thereafter, and the ultimate termination of her employment on June 25, 1999, constitute adverse employment actions which are causally related to her protected activity. Plaintiff has adequately made out a claim of retaliation under this theory.

*Retaliation – ADA*

Plaintiff further claims that defendant wrongfully terminated her based on her disability. She relies on the Americans with Disabilities Act ("ADA"), which prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual" in regard to terms and conditions of employment.  42 U.S.C. § 12112(a).

Defendants argue that as a matter of law plaintiff is not a "qualified individual with a disability," which is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position" in issue.  42 U.S.C. § 12111(8).  The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C. § 12102(2)(A).

-7-

Even accepting the truth of plaintiff's allegations, she cannot establish that she was a "qualified individual with a disability." On one hand, she apparently claims that she was medically unfit to work due to psychological trauma, in which case she was unable to perform the essential functions of her job, regardless of whether PSMI attempted to accommodate her. On the other hand, plaintiff appears to claim that she was able to perform the essential functions of her job provided that she was not required to work in proximity to Foriero, that is, that she was disabled only from working in proximity to Foriero, and that PSMI should have accommodated her by removing Foriero from her workplace. Working in proximity to Foriero is not, however, a major life activity, and plaintiff's inability to do so, without more, is not a disability within the meaning of the ADA. PSMI has demonstrated its entitlement to summary judgment dismissing plaintiff's ADA claim.

### *Burlington-Faragher defense*

PSMI raises the *Burlington-Faragher* affirmative defense, claiming that plaintiff unreasonably failed to take advantage of the preventive or corrective avenues provided by the employer. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998). PSMI's employee handbook, issued May 27, 1998, sets forth the following two paragraphs under the heading, "Grievances, Problems or Misunderstandings":

> If you have a complaint or a work-related problem, or if you feel that you are not being treated fairly, you should discuss this with your immediate supervisor. After this discussion, if your complaint or problem has not been resolved, you should bring it to the attention of Human Resources.

> Experience shows that most problems can be settled by examination and open discussion of all the facts. Management is sincerely interested in treating all employees fairly. Your problem will be given prompt attention.

As plaintiff points out, there was no specific sexual harassment policy, nor was there a grievance

-8-

or complaint procedure.  During most of the incidents in issue, Foriero was plaintiff's immediate supervisor; thus, he was the person with whom she was to discuss her complaints according to the above-quoted portion of the handbook.  Plaintiff also states that in October 1998 Foriero prevented her from attending a sexual harassment seminar, and in early February 1999 he told her that he would fire her if she spoke with Hornstein.

Plaintiff also points to the affidavit of PSMI's human resources manager, Hornstein, concerning her response on February 27, 1999, when Foriero told her about the events of that day:

> I was uncertain as to how I should respond to this situation from a human resource perspective.  Had I been presented with these same facts involving another manager and his or her subordinate, I would have discussed the issue with Mr. Foriero as President.  However, because Mr. Foriero was the President, not to mention an owner, I was unsure what to do.  I sought the advice of my husband and also my uncle who is a police officer, as well as Paul Hartman, the CFO of PSMI as to how I should respond. I ultimately decided that I should inform Jay Bernhardt as he was also an owner of PSMI.

Referring to this passage from Hornstein's affidavit, plaintiff argues:

> If Ms. Hornstein, the Human Resource Manager, was unsure what to do about the President's behavior, how was I supposed to know what to do without any policies im place and with the President of the company threatening my job if I went to the Human Resource Manager about any of these issues.  This is clear indication that this company had no complaint mechanism, no grievance policy, no one qualified to hear any grievance or complaints, and when the President of the company is doing the harassing and the manipulating and the threatening and the punishing, where was I to turn?

Even assuming that PSMI has submitted sufficient evidence to carry its initial burden of proof on the *Burlington-Faragher* affirmative defense, plaintiff's submissions are sufficient to defeat summary judgment on this issue.

**Motion for summary judgment by JGB**

JGB moves for summary judgment (Dkt. No. 48).  It contends that it is not an

-9-

employer of plaintiff and played no part in the events of which plaintiff complains.

Plaintiff relies on the "single employer doctrine" in support of her contention that she has a viable claim against JGB.  In determining whether entities are sufficiently related to warrant joint liability for the acts of the immediate employer, courts assess the degree of (1) centralized control of labor relations; (2) interrelated operations; (3) common management; and (4) common ownership.  *See Dewey v. PTT Telecom Netherlands, U.S., Inc*., 1995 WL 425005, \*2 (S.D.N.Y. 1995), *aff'd without opinion*, 101 F.3d 1392 (2d Cir. 1996) (citing *Kellett v. Glaxo Enterprises, Inc*., 1994 WL 669975, \*2 (S.D.N.Y. 1994)).  The Second Circuit has noted that centralized control of labor relations is the most crucial factor and that the critical question to be answered regarding this factor is: "What entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Cook v. Arrowsmith Shelburne, Inc*., 69 F.3d 1235, 1240 (2d Cir.1995) (quotation omitted). This factor of the *Cook* test may be satisfied by demonstrating an amount of participation that is "sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions."  *Id.* at 1241 (citation omitted).

With respect to common ownership, it is undisputed that Bernhardt was 100% owner of JGB and 80% owner of PSMI.  With respect to interrelation of operations, the evidence shows that PSMI maintained its own separate offices, bank accounts, personnel policies, employee benefits, equipment, and financial and payroll records.  Nor is there evidence that JGB exercises control over the day-to-day operations of PSMI; for example, when PSMI performed work for JGB, it did so pursuant to contracts for which it had to bid.  With respect to common management, there is evidence that Robert Zywicki was an officer of both

-10-

companies.  There does not appear to be overlap of other named officers or managers

Considering finally the most important factor, centralized control of labor relations, *see Dewey*,1995 WL 425005 at *2,  the evidence is that PSMI maintained its own human resources department separate from JGB's and made its own decisions as to hiring, promoting disciplining, and terminating employees; that plaintiff received no compensation or benefits from JGB, did not report to anyone at JGB, and was not assigned work by anyone at JGB; and that Foriero, her supervisor at PSMI, held no position with JGB.  While at PSMI, plaintiff received raises and promotions, which were awarded solely by PSMI (specifically, Foriero, Hornstein, and Lis).  When plaintiff went out on leave as a result of the incidents complained of herein, Hornstein of PSMI stayed in contact with her, monitored her leave status and ultimately terminated her on June 25, 1999.  Such evidence supports JGB's position on this motion.

However, plaintiff relies on the deposition testimony of Mike Hill, Human Relations Director of JGB, to the effect that in 1998 and 1999 his responsibilities expanded beyond JGB to "other affiliate companies" including PSMI; that he "started working more closely with people at [PSMI]" in 1999; that he was available to provide assistance and consultation on an as-needed basis to Carol Hornstein, Human Resources Manager at PSMI, and to the human resource managers of JGB's other affiliates; that he assisted Hornstein in developing an employee handbook for PSMI and some of his materials were directly incorporated into PSMI's materials; that within a week after Bernhardt learned of problem between plaintiff and Foriero on February 27, 1999, Hill met with Bernhardt about the problem; that Hill recommended that an outside consultant be retained to investigate; that Hill chose Don Norton

-11-

to conduct the investigation and contacted him; and that Hill attended the first meeting with Norton and Bernhardt on March 10, 1999.  This and subsequent meetings were also usually attended by Zywicki, whom Hill characterized as Bernhardt's "Number 2 most-trusted confidant and advisor."  According to Hill, JGB retained Norton and was billed for his services, and Norton kept both Bernhardt and Hill apprised of the investigation as it progressed.  Hill further stated that Hornstein was involved in the investigation as "representative of PSMI."

In this connection, Hornstein testified that beginning in early March 1999, Hill became "very involved" in the matter involving plaintiff "because of his human resource experience."  She stated that once Hill became involved, she "mostly" communicated with him, and he communicated with Bernhardt.  She kept Mike Hill informed of plaintiff's leave status and discussed the matter with him before she sent the June 25, 1999 termination letter to plaintiff.

Plaintiff also points to Bernhardt's involvement in the efforts to resolve the problems between her and Foriero after February 27, 1999.  Bernhardt states that on February 27, 1999, when plaintiff told Bernhardt that Foriero had terminated her, Bernhardt told her she was not terminated.  On March 25, 1999, Bernhardt wrote a letter to plaintiff on paper with a JGB letterhead requesting that she meet with Donald Norton, the investigator.

Based on the record, the Court concludes that, despite the absence of proof that JGB had total control over PSMI's labor relations, there is sufficient evidence in the record to establish JGB's participation in the total employment process so as to warrant denial of JGB's motion for summary judgment.  *See Cook*, 69 F.3d at 1240-41.

-12-

Further, if plaintiff is able to carry her burden of proof on this issue at trial, the same evidence may also demonstrate an identity of interest such that her claims against JGB are not time-barred pursuant to 42 U.S.C. § 2000e-5(e).  JGB's motion for summary judgment is denied.

## CONCLUSION

It is therefore

ORDERED that the motion by defendant J.G.B. Enterprises, Inc. (Dkt. No. 48) for summary judgment is denied; and it is further

ORDERED that the motion by defendant Precision Systems Mfg., Inc. (Dkt. No. 59) for summary judgment is granted insofar as it seeks dismissal of plaintiff's claims under the Americans with Disabilities Act and otherwise denied.

IT IS SO ORDERED.

February 27, 2006
Syracuse, New York

Norman A. Mordue
U.S. District Judge

-13-